79 P.3d 686

**STATE of Hawai'i, Plaintiff–Appellee,**

v.

**Lance S.K. MARTIN, Defendant–Appellant.**

No. 24744.

Intermediate Court of Appeals of Hawai'i.

Oct. 29, 2003.

Matthew S. Kohm, Pukalani, on the briefs, for defendant-appellant.

Richard K. Minatoya, Deputy Prosecuting Attorney, County of Maui, on the briefs, for plaintiff-appellee.

BURNS, C.J., WATANABE and LIM, JJ.

Opinion of the Court by BURNS, C.J.

Defendant–Appellant Lance S.K. Martin (Martin) appeals from the November 7, 2001 "Judgment, Guilty Conviction and Sentence" (Judgment) entered in the Circuit Court of the Second Circuit (circuit court), Judge Shackley F. Raffetto presiding, convicting Martin of Count One, Extortion in the First Degree, Hawaii Revised Statutes (HRS) § 707–765(1)(a) (1993),[1] and Count Two, Ownership or Operation of Business by Certain Persons Prohibited, HRS § 842–2 (1993),[2] and sentencing him to imprisonment for ten years on each count for a total of twenty years, and a mandatory minimum imprisonment period of three years and four months. In addition, the court ordered Martin to pay a $2,000 restitution to the victim and a $400 Crime Victim Compensation Fee and specified that "PAYMENTS OF RESTITUTION AND CRIME VICTIM COMPENSATION FEE TO BE DETERMINED BY THE DEPARTMENT OF PUBLIC SAFETY [ (DPS) ] WITH RESTITUTION TO BE PAID FIRST."[3]

On appeal, Martin argues:

1. Hawaii Revised Statutes (HRS) § 707–765(1)(a) (1993) states, in relevant part, as follows: "A person commits the offense of extortion in the first degree if the person commits extortion: ... [of] property or services the value of which exceeds $200 in total during any twelve-month period[.]"

2. HRS § 842–2 (1993) states, in relevant part, as follows:

It shall be unlawful:
(1) For any person who has received any income derived, directly or indirectly, from a racketeering activity or through collection of an unlawful debt, to use or invest, directly or indirectly, any part of such income, or the proceeds of such income, in the acquisition of any interest in, or the establishment or operation of, any enterprise.

1. There was insufficient evidence to convict him of (a) Count One, HRS § 707–765, or (b) Count Two, HRS § 842–2.

2. With respect to Count Two, (a) the indictment was invalid because it failed to charge the essential element of "racketeering activity" and (b) the circuit court's jury instructions were "prejudicially insufficient, misleading and incomplete."

3. The trial court "improperly ordered restitution" when it failed to comply with the requirement that an "order of restitution must be based upon a finding that the defendant can pay the amount. Such a determination must be made by the Court and cannot be delegated."

We disagree with argument 1(a). We agree with arguments 1(b) and 3. In light of our agreement with argument 1(b), argument 2 is a moot argument and will not be discussed.

## BACKGROUND

On February 26, 2001, a grand jury indictment (Indictment) in Cr. No. 01–1–0100 charged Martin, Rocky A. Sanches (Rocky), and Robbie A. Sanches (Robbie),[4] as follows:
*COUNT ONE:* (00–34665)

That on or about the 23rd day of April, 2000, in the County of Maui, State of Hawaii, [Martin], ... as [principal] and/or [accomplice] did, with intent to deprive, obtain or exert control over the property or services of Benadicto Caberto, to wit, United States currency, the value of which

(2) For any person through a racketeering activity or through collection of an unlawful debt to acquire or maintain directly or indirectly, any interest in or control of any enterprise.
(3) For any person employed by or associated with any enterprise to conduct or participate in the conduct of the affairs of the enterprise through racketeering activity or collection of an unlawful debt.

3. When the Judgment specified "PAYMENTS OF RESTITUTION AND CRIME VICTIM COMPENSATION FEE TO BE DETERMINED BY THE DEPARTMENT OF PUBLIC SAFETY[,]" it appears that the reference was to the Hawai'i Paroling Authority.

4. Rocky A. Sanches and Robbie A. Sanches are biological brothers.

property or services exceeded Two Hundred Dollars ($200.00), by threatening by word or conduct to cause bodily injury in the future to Benadicto Caberto, thereby committing the offense of Extortion in the First Degree in violation of Section 707–765(1)(a) of the Hawaii Revised Statutes.

*COUNT TWO:* (00–36982)

That on or about the 23rd day of April, 2000, in the County of Maui, State of Hawaii, [Martin], ... as [principal] and/or [accomplice], did intentionally, through threat, involving, but not limited to gambling, criminal property damage, robbery, bribery, extortion, theft or prostitution, or through collection of an unlawful debt, acquire or maintain, directly or indirectly, any interest in or control of any enterprise thereby committing the offense of Racketeering in violation of Section 842–2(2) of the Hawaii Revised Statutes.

Subsequently, the charges against Rocky and Robbie were dropped. Martin's trial began on September 4, 2001. On September 5, 2001, Plaintiff–Appellee State of Hawai'i (State) called the victim, Benadicto Caberto (Caberto),[5] as its first witness.

Caberto testified that he had lived on the island of Lana'i for about 21 years and had worked for Maui Electric on Lana'i from 1988 until September 1999 when an injury caused him to stop working and start drawing disability benefits. At the time of the alleged incident, he was still on disability.

According to Caberto, the Lana'i Community Gardens is "funded by David Murdock for those people who raise chicken [sic].... So he kind of opens his five acre area for all the livestock to raise there." Caberto stated that he had "a contract to collect the billings" for the water consumption fee of "$1.62 per thousand gallon ... [every] two months. We follow Lana'i Company's billings." Caberto's wife sold chicken feed.

Caberto testified that on April 23, 2000, at around 7:30 p.m., he was in his aunt's garage at 1250 Frasier Avenue with his aunt's family, about 20 people, celebrating Easter Sun-

day, when he heard someone call his name. Caberto identified the person calling his name as Rocky. Caberto followed Rocky out of the garage to meet a man later identified as Martin. According to Caberto, the following conversation ensued:

Q. Now, after [Martin] identified himself to you, what happened next?

A. After he identified himself to me, he told me that he was sent to Lana'i by his big boss to collect gambling and drug money.

Q. And what was your response?

A. So I told him, "What do you mean by gambling money and drug money?"

. . . .

Q. .... What did [Martin] say?

A. Then he said, he said, "Don't mess with me. The big boss sent me to Lana'i to control Lana'i. We control Maui, now we going [sic] to control Lana'i."

. . . .

Q. Did you ask him how much money he was talking about?

A. Yeah. I asked him, "How much do you want?" And he said, "Two thousand dollars."

So then I told him, "Where can I get that amount of money?"

. . . .

Q. Did you tell him how much you had?

A. I told him I had seven hundred dollars.

Q. And how did he respond when you told him that?

A. He told me the same thing that, "Don't mess with me. I know you have plenty of money. I need to collect the two thousand dollars." So he got to send it back to his boss.

Q. ....

... [Then] what happened?

A. And then—and then he tried to tell me, "If you run the game, the chicken fight and deal drugs, then I give you police protection."

---

5. The victim's first name is spelled "Benadicto" in the indictment; however, his name is spelled

"Benedicto" elsewhere in the case.

Q. Did Mr.—did the defendant ever make any statements or ask any questions about your family at all?

A. Yes, he did. He asked me how much—how much—how much kids [sic] do I have.

. . . . .

Q. Anything else that he asked you?

A. At one time during the conversation by my uncle's at the same place, they asked me, "Hey, brother, you know that [sic] crutches you have on, that's nothing. I can put you to live [sic] in a wheelchair."

Q. Okay. How did you feel when he said that?

A. From that time kind of feel—I was kind of feel [sic] threatened and more afraid for my kids.

. . . .

Q. What did you understand the defendant to mean by running the games?

A. What I understand or what he was saying is maybe he is—at one time he asked me, "I am gouging money from the chicken fight."

Q. What does that mean, "gouging money from the chicken fight"?

A. Taking percentage of the money.

Q. All right. Let's talk about that, Mr. Caberto. Do you go to chicken fights on Lana'i?

A. Yes, I do.

Q. Do you raise chickens where, I guess, you call it cock fighting on Lana'i?

A. Yes.

Q. And who do you raise those chickens for?

A. I raise the roosters. My brothers fight the roosters.

. . . .

Q. Okay.

At some point did you and the defendant come to some agreement as to the amount that would be paid and how it would be paid?

A. Yeah. And then he asked, "You have two hours to pay it, or two thousand dollars, two hours."

Caberto testified that $900 came from "a wad of collection from the Lana'i Community Gardens. That was the collection and retailing chicken feed." Caberto further testified that he borrowed the other $1,100 from his brother, Romeo Caberto (Romeo). After Caberto acquired the $2,000, Caberto and Romeo drove to the home of Robbie where Romeo gave Robbie an envelope containing the money to give to Martin. Upon receipt of the envelope, Robbie opened and looked in it. Caberto and Romeo then returned to their aunt's place. About fifteen to thirty minutes after Caberto returned to the "party," Robbie "came to the party."

Romeo testified that on April 23, 2000, at around 7:30 p.m., Rocky came and talked to Caberto on the property where the Caberto family was gathered. Romeo saw Caberto talking to Rocky. Romeo spoke to Caberto after seeing Rocky leave. Caberto appeared scared. Romeo gave Caberto $1,100, went with Caberto to Robbie's house and personally gave Robbie an envelope containing $2,000 to give to Martin. Robbie opened the envelope and Romeo "told [Robbie] that everything was there, the amount they were asking for." About thirty minutes later, at the Caberto family gathering, Romeo talked to Robbie.

Robbie testified that on the evening of April 23, 2000, Romeo gave him an envelope to give to Martin. Robbie did not look to see what was inside the envelope, but was told by Romeo that it had "something to do with chicken—chicken fight." When Robbie located Martin, Robbie told Martin he had something for Martin from Romeo. Robbie and Martin then went out to Robbie's car where Robbie gave Martin the envelope. After giving Martin the envelope, Robbie "went back to Romeo's uncle's house and [he] talked to him about work-related stuff. And then [he] told him, 'Oh, I found [Martin] and I gave him the envelope.'" On cross-examination, Robbie stated that the envelope did not feel "like it had two thousand dollars of various denomination of cash" in it.

Martin testified that on April 23, 2000, he went with Rocky to ask Caberto about leasing a parcel of land at Lana'i Community Gardens so that he could raise chickens.

Martin asked Caberto about raising chickens and walked with him to the garage where Caberto stored chicken feed and hay. After speaking with Caberto, Martin and Rocky left. Later that evening, Martin spoke with Robbie and was given an envelope that Robbie said was from Romeo. According to Martin, the envelope contained "price quotes about hardware and the chicken drop pens, and just a whole bunch of like [sic] the feed, what was it costing." Because he thought the prices were too high, Martin threw away the envelope and the price quotes. Martin's testimony concluded his defense. Defense counsel then orally made a motion for judgment of acquittal which the court denied.

On September 10, 2001, the court read its instructions to the jury, in relevant part, as follows:

16. In count one of the indictment the defendant, [Martin], is charged with the offense of extortion in the first degree. A person commits the offense of extortion in the first degree if he obtains or exerts control over the property or services of another person, the value of which exceeds $200.00 in total, during any 12 month period, with the intent to deprive the other person of the property or services by threatening by word or conduct to cause bodily injury in the future to the person threatened or to any other person.

There are four material elements of the offense of extortion in the first degree, each of which the prosecution must prove beyond a reasonable doubt. These four elements are; one, that on or about April 23, 2000, in the County of Maui, State of Hawaii, [Martin], obtained or exerted control over the property or services of [Caberto], and two; that the defendant did so with the intent to deprive [Caberto] of the property or services; and three, that the defendant did so by intentionally threatening by word or conduct to cause bodily injury in the future to [Caberto]; and four, that the value of the property or the services exceeded $200.00 in total value during any 12 month period.

17. Property means any money.

. . . .

20. In count two of the indictment the defendant, [Martin], is charged with the offense of racketeering. A person commits the offense of racketeering if he intentionally through threat involving but not limited to gambling, criminal property damage, property robbery—criminal property damage, robbery, bribery, extortion, theft or prostitution or through collection of an unlawful debt, did acquire or maintain directly or indirectly any interest in or control of any enterprise.

There are three material elements of the offense of racketeering, each of which the prosecution must prove beyond a reasonable doubt.

These three elements are; one, on or about April 23, 2000, in the County of Maui, State of Hawaii, the defendant, [Martin], did, through threat, involving but not limited to gambling, criminal property damage, robbery, bribery, extortion, theft or prostitution or through collection of an unlawful debt, acquire or maintain directly or indirectly any interest in or control of any enterprise; and three, that he did so intentionally.

21. Racketeering activity means any act or threat involving but not limited to gambling, extortion or theft.

22. Enterprise means any group of individuals associated for a particular purpose although not a legal entity.

### RELEVANT STANDARDS OF REVIEW

#### A.

#### Sufficiency of the Evidence

The Hawai'i Supreme Court has often stated that

evidence adduced in the trial court must be considered in the light for the prosecution when the appellate court passes on the legal sufficiency of such evidence to support a conviction; the same standard applies whether the case was before a judge or jury. The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact.

*State v. Richie,* 88 Hawai'i 19, 33, 960 P.2d 1227, 1241 (1998).

## B.

### Sentencing

■■■ "The authority of a trial court to select and determine the severity of a penalty is normally undisturbed on review in the absence of an apparent abuse of discretion or unless applicable statutory or constitutional commands have not been observed." *Barnett v. State,* 91 Hawai'i 20, 26, 979 P.2d 1046, 1052 (1999) (citations and internal quotation marks omitted). In other words:

> while a sentence may be authorized by a constitutionally valid statute, its imposition may be reviewed for plain and manifest abuse of discretion.
>
> Admittedly, the determination of the existence of clear abuse is a matter which is not free from difficulty[,] and each case in which abuse is claimed must be adjudged according to its own peculiar circumstances. Generally, to constitute an abuse[,] it must appear that the court clearly exceeded the bounds of reason or disregarded rules or principles of law or practice to the substantial detriment of a party litigant.

*State v. Gaylord,* 78 Hawai'i 127, 144, 890 P.2d 1167, 1184 (1995) (citations omitted); *see State v. Rauch,* 94 Hawai'i 315, 322, 13 P.3d 324, 331 (2000).

## DISCUSSION

### A.

#### 1.

■■■ HRS § 707–765 states that a "person commits the offense of extortion in the first degree if the person commits extortion . . . [of] property or services the value of which exceeds $200 in total during any twelve-month period[.]" HRS § 707–764(1) states, in relevant part, that a "person commits extortion if he does any of the following: . . . [obtains], or exerts control over, the property

or services of another with intent to deprive him of the property or services." The Indictment was more specific than required by this statute. The Indictment charged that Martin acted "with intent to deprive, obtain or exert control over the property or services of [Caberto.]" Thus, the trial court's relevant jury instruction stated "the prosecution must prove beyond a reasonable doubt . . . that on or about April 23, 2000, in the County of Maui, State of Hawaii, the defendant, [Martin], obtained or exerted control over the property or services of [Caberto.]"

Martin argues that there was insufficient evidence to convict him of violating HRS § 707–765 because there was no evidence that more than $200 of the $2,000 payoff money belonged to Caberto. We disagree. The evidence that Caberto borrowed $1,100 from his brother, Romeo, and gave it to Martin is the required evidence. When Caberto borrowed the money, it became his.

#### 2.

■■■ Martin argues that there was insufficient evidence to convict him of HRS § 842–2, Ownership or Operation of Business by Certain Persons Prohibited. Martin asserts that the evidence was "ambiguous as to whether any other individuals were involved with Martin to specifically engage in racketeering activity" because all charges were dropped against Rocky and Robbie and Robbie's testimony did not show a common purpose. Martin contends that the State failed to establish a continuity of organizational structure and personnel and, thus, did not satisfy its burden of proof that Martin and others were engaged in an illegal enterprise constituting racketeering activity. Martin also argues that the trial court reversibly erred when, in denying his motion for a judgment of acquittal, it concluded that "sufficient evidence" allowed the charge to go to the jury instead of the required "substantial evidence".[6] Finally, Martin argues that because the State attempted to prove Martin

---

6. This point lacks merit. "Sufficient evidence" is whatever evidence the law requires in the particular case. In this case the law requires "substantial evidence." " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a [person] of reasonable caution to support a conclusion.". *State v. Duldulao,* 86 Hawai'i 143, 146, 948 P.2d 564, 567 (1997) (citations omitted).

extorted money from Caberto and used the same act to try to prove that Martin was involved in racketeering, HRS § 701–109(1)(d) (1993) [7] bars his conviction because "the statute prohibits conviction of more [than] one offense when the convictions are based upon the same conduct."

"The State concedes that it failed to establish that the extortion was to occur on a continuing basis" and/or that there was an organization behind the extortion. Consequently, the State joins Martin in asking this court to reverse the conviction on Count II.

 The Hawai'i Supreme Court has stated, however, that

> even when the prosecutor concedes error, before a conviction is reversed, "it is incumbent on the appellate court [first] to ascertain ... that the confession of error is supported by the record and well-founded in law and [second] to determine that such error is properly preserved and prejudicial." In other words, a confession of error by the prosecution "is not binding upon an appellate court, nor may a conviction be reversed on the strength of [the prosecutor's] official action alone."

*State v. Hoang*, 93 Hawai'i 333, 336, 3 P.3d 499, 502 (2000) (citations omitted).

Upon a review of the record, we agree with Martin and the State that the State failed to present sufficient evidence to support the decision of the jury.

### B.

Both the State and Martin cite to *State v. Ontai*, 84 Hawai'i 56, 929 P.2d 69 (1996), for its interpretation of HRS § 842–2(3) and definition of the term "enterprise." In *Ontai*, the Hawai'i Supreme Court stated that there were three characteristics of a Racketeer Influenced and Corrupt Organizations (RICO) [8] Act enterprise:

First, there must be a common or shared purpose that animates the individuals associated with it. Second, it must be an "ongoing organization" whose members "function as a continuing unit"; in other words, there must be some continuity of structure and of personnel. Third, there must be an ascertainable structure distinct from that inherent in the conduct of ... racketeering activity.

*Ontai*, 84 Hawai'i at 62, 929 P.2d at 75 (quoting *United States v. Kragness*, 830 F.2d 842, 855 (8th Cir.1987)) (citation omitted).

#### 1. Common or Shared Purpose

 "A common purpose is shown by evidence that the individuals involved shared the same goal or objective." *Ontai*, 84 Hawai'i at 64, 929 P.2d at 77. In the present case, there was no evidence that Martin and either or both of the Sanches brothers shared a common goal or objective. The evidence of Rocky's introduction of Caberto to Martin and presence during their conversation and Robbie's handling of the envelope is insufficient. Caberto's testimony that Martin said "the big boss sent me to Lana'i to control Lana'i[,]" raises the possibility that someone was directing Martin's actions; however, there were no other indications that another individual was involved.

#### 2. Ongoing Organization/Continuity of Structure and Personnel

 "Continuity of structure is shown by 'an organizational pattern or system of authority that provides a mechanism for directing the group's affairs on a continuing, rather than an ad hoc, basis.'" *Ontai*, 84 Hawai'i at 64, 929 P.2d at 77 (quoting *Kragness*, 830 F.2d at 856). "Continuity of personnel is shown by 'associational ties [among the individuals that] amount to an organizational pattern or system of authority.'" *Id.*

---

**7.** HRS § 701–109· (1993) provides, in relevant part, as follows:

(1) When the same conduct of a defendant may establish an element of more than one offense, the defendant may be prosecuted for each offense of which such conduct is an element. The defendant may not, however, be convicted of more than one offense if:

. . . .

(d) The offenses differ only in that one is defined to prohibit a designated kind of conduct generally and the other to prohibit a specific instance of such conduct[.]

**8.** *See* 18 U.S.C. §§ 1961–68 (2000), otherwise known as the Racketeer Influenced and Corrupt Organizations (RICO) Act.

(quoting *United States v. Lemm,* 680 F.2d 1193, 1199 (8th Cir.1982)). Only Martin's alleged reference to the "big boss" ties him to an ongoing organization with a system of authority directing individuals in furtherance of the alleged group goals of controlling gambling and drugs on Maui and Lana'i.·

### 3. Ascertainable Structure Distinct from that Inherent in the Conduct

An ascertainable structure distinct from that inherent in the conduct is shown if, in setting aside those acts of racketeering, "there is still evidence of other legal or illegal acts that show an ongoing organization[.]" *Id.* Here, there was no evidence of an ascertainable structure distinct from the alleged act of extortion or that an ongoing organization existed.

### C.

Martin argues that the trial court erred by "improperly [ordering] restitution" without expressly determining his ability to pay and by delegating the authority to determine the payment amounts and timing to the DPS. The State agrees that "the trial court should not have delegated the matter of the manner of payment of restitution to the [DPS]." In light of *Gaylord,* 78 Hawai'i 127, 890 P.2d 1167 (1995), we agree with Martin and the State and vacate the restitution order. Now we must answer the following question: How should the sentencing court proceed on remand?

The Judgment ordered Martin to pay restitution of $2,000 and a Crime Victim Compensation Fee of $400 and ordered the "PAYMENTS OF RESTITUTION AND CRIME VICTIM COMPENSATION FEE TO BE DETERMINED BY THE [DPS] WITH RESTITUTION TO BE PAID FIRST."

The Hawai'i Supreme Court opinion in *Gaylord* was filed on March 14, 1995. When *Gaylord* was filed, the situation was similar to the situation in *Kelly v. Robinson,* 479 U.S. 36, 107 S.Ct. 353, 93 L.Ed.2d 216(1986), where the United States Supreme Court held that restitution obligations, imposed upon a criminal defendant as conditions of her probation in state criminal proceedings, were not subject to discharge in a Chapter 7 bankruptcy proceeding. The Supreme Court decided that the Bankruptcy Code creates a broad exception for all penal sanctions, whether they be denominated fines, penalties, or forfeitures, and this result was not altered by the facts that, unlike traditional fines, restitution is forwarded to the victim, and may be calculated by reference to the amount of harm the offender has caused. The court noted that restitution was a condition of probation and the Connecticut statute being challenged in that case did not allow the victim to enforce a right to receive payment. In footnote no. 2, the Supreme Court also noted that "[there] is some uncertainty about the total amount Robinson was ordered to pay. Although the judge imposed restitution in a total amount of $9,932.95, five years of payments at $100 a month total only $6,000." *Robinson,* 479 U.S. at 38, 107 S.Ct. 353, n. 2. Implicitly, the Supreme Court recognized that the restitution order was not enforceable after the completion of probation.

When *Gaylord* was filed, the HRS stated, in relevant part, as follows:

§ **706–605 Authorized disposition of convicted defendants.** ... [The] court may sentence a convicted defendant to one or more of the following dispositions:

(a) To be placed on probation as authorized by part II of this chapter;

. . . .

(d) To make restitution in an amount the defendant can afford to pay; provided that if the court orders, in addition to restitution, payment of fine in accordance with paragraph (b), the payment of restitution shall have priority over the payment of the fine[.]

HRS § 706–605(1)(a) & (d) (1993).

§ **706–644 Consequences of nonpayment; imprisonment for contumacious nonpayment; summary collection.** (1) When a defendant sentenced to pay a fine or restitution defaults in the payment thereof or of any installment, the court, upon the motion of the prosecuting attorney or upon its own motion, may require the defendant to show cause why the defendant's default should not be treated as contumacious and may issue a summons or

a warrant of arrest for the defendant's appearance. Unless the defendant shows that the defendant's default was not attributable to an intentional refusal to obey the order of the court, or to a failure on the defendant's part to make a good faith effort to obtain the funds required for the payment, the court shall find that the defendant's default was contumacious and may order the defendant committed until the fine, restitution, or a specified part thereof is paid.

. . . .

(5) Upon any contumacious default in the payment of a fine or restitution or any installment thereof, execution may be levied and such other measures may be taken for the collection of the fine, or restitution, or the unpaid balance thereof as are authorized for the collection of an unpaid civil judgment entered against the defendant in an action on a debt.

HRS § 706–644(1) & (5) (1993).

In *Gaylord*, the Hawai'i Supreme Court stated, in relevant part, as follows:

[In] the criminal justice context, restitution is to a fine as, in the civil context, compensatory damages are to punitive damages.

Although statutorily authorized by HRS § 706–605(1)(d), a sentencing court's discretion to order restitution is not boundless. "Advocates of criminal restitution are convinced [that] it is not necessarily incompatible with the incarceration of offenders. And we concur. However, even the supporters of the concept acknowledge [that] its implementation is fraught with difficulty, primarily because incarceration normally entails a concomitant loss of earning capacity."

. . . HRS § 706–765(1)(d) limits restitution orders to "an amount the defendant can afford to pay." In this connection, and despite the fact that the sentencing court "may delegate to the Adult Probation Division the function of making recommendations . . . on the amount of restitution and the manner of payment, the court has the exclusive responsibility and function of imposing a sentence." Thus, "requisite specificity should be provided by the sentencing court and ought not be left

to subsequent administrative determination," because "[without] express legislative authority, the court cannot delegate the sentencing function to another person or entity." . . . Accordingly, "it is incumbent upon the [sentencing] court to enter into the record findings of fact and conclusions that the manner of payment is reasonable and one which [the defendant] can afford."

*Gaylord*, 78 Hawai'i at 152–53, 890 P.2d at 1192–93 (footnote and citations omitted).

In footnote 50 of *Gaylord*, the court stated, in relevant part, as follows:

HRS § 706–605(1)(d) imposes upon the sentencing court "the exclusive responsibility and function of determining the amount of restitution," . . . and . . . the sentencing court does so by "taking into consideration the defendant's circumstances known to the court at the time the sentence is imposed." . . . It seems intuitively obvious to us that a sentencing court cannot determine restitution "in an amount the defendant can afford to pay" without determining the manner of payment.

It should be emphasized that under existing law, sentencing courts retain supervisory jurisdiction over defendants subject to restitution orders—both as to amount and manner of payment.

*Gaylord*, 78 Hawai'i at 153 n. 50, 890 P.2d at 1193 n. 50. The court cited HRS § 706–644 (Supp.1992) and HRS § 706–645 (Supp.1992) in support of this last phrase.

Thus, as stated in footnote 50 of *Gaylord*, the precedent in Hawai'i is that "a sentencing court cannot determine restitution 'in an amount the defendant can afford to pay' without determining the manner of payment[.]" *Id.* To this we add the thought that, unless the payment will be in one payment or a few installments, neither the amount nor the installments can be determined without first deciding the time period available for the payment. A problem is presented by the fact that although a determination of the defendant's current ability to pay is based on present facts, a determination of the defendant's ability to pay in the future (1) while the restitution order remains

unsatisfied and enforceable [9] and (2) during the continuation of the jurisdiction of the criminal court, the paroling authority, and/or the civil courts over the defendant with respect to enforcement of the restitution order is, at best, an informed prediction and, at worst, a guess.[10]

The Hawai'i Supreme Court opinion in *Gaylord* was followed by significant and substantial statutory amendments. In 1998, Conf. Com. Rep. No. 89 on H.B. No. 2776 (which became Act 269 and the essence of HRS § 706–646 (Supp.2002)) stated, in relevant part, as follows:

This bill allows victims of crime to enforce a criminal restitution order in the same manner as a civil judgment. Under current law, the court may require a defendant to pay restitution for the losses caused to the victim. Collection of this restitution is left to governmental entities like the Judiciary, Public Safety, and Paroling Authority, which often are able to collect only a small fraction of the amount.

There are few other options.... And although a victim may bring a civil action against the defendant, this process is costly and time consuming.

Therefore, your Committee on Conference believes that victims should have a "fast track" ability to be compensated for their losses by allowing them to enforce the criminal restitution order as a civil judgment, using all of the civil collection remedies.

1998 Senate Journal at 780. The 1998 statutory changes were discussed by this court in *State v. Johnson,* 92 Hawai'i 36, 986 P.2d 987 (1999).

In relevant part, the Hawai'i statutes now state as follows: [11]

§ 706–605 **Authorized disposition of convicted defendants.** (1) Except as provided in parts II [Probation] and IV [Imprisonment] of this chapter or in section 706–647 [Civil enforcement] and subsections (2) and (6) of this section and subject to the applicable provisions of this Code, the court may sentence a convicted defendant to one or more of the following dispositions:

(a) To be placed on probation as authorized by part II of this chapter;

(b) To pay a fine as authorized by part III and section 706–624 of this chapter;

(c) To be imprisoned for a term as authorized by part IV of this chapter;

(d) To make restitution in an amount the defendant can afford to pay; [12] provided that the court may order any restitution to be paid to victims pursuant to section 706–646 ["Victim restitution"] or to the crime victim compensation special fund in the event that the victim has been given an award for compensation under chapter 351 and, if the court orders, in addition to restitution, payment of fine in accordance with paragraph (b), the payment of restitution and a compensation fee shall have priority over the payment of the fine; payment of restitution shall have prior-

9. These words of limitation are used in light of the defendant's life expectancy and the possibilities, however remote, that Hawai'i restitution orders may be subject to the time limitation stated in HRS § 657–5 and/or be dischargeable in bankruptcy.

10. Rather than to set specific terms of future payment based on predictions and guesses, it would be reasonable for the court to order the defendant to pay an amount of monetary restitution he or she reasonably should be able to pay during the periods while (1) the restitution order remains unsatisfied and enforceable and (2) the criminal court, the paroling authority, and/or the civil courts have jurisdiction over the defendant with respect to enforcement of the restitution order, and to leave all payment and collection issues (a) to the criminal court's authority under HRS §§ 706–624, –625, and/or –644, (b) to the paroling authority's authority under HRS § 706–670, and (c) to the State's and/or the victim's utilization of the laws governing the collection of a judgment in a civil action.

11. Many of the relevant statutory changes were noted by this court in *State v. Johnson,* 92 Hawai'i 36, 986 P.2d 987 (1999). Some of the noted changes did not apply in *Johnson* because they became law after the defendant in *Johnson* was convicted and sentenced.

12. In contrast to this provision, HRS § 706–646(3) (Supp.2002) states that "[restitution] shall be a dollar amount that is sufficient to reimburse any victim fully for losses[.]" *See infra* note 13.

ity over payment of a compensation fee; or

(e) To perform services for the community under the supervision of a governmental agency or benevolent or charitable organization or other community service group or appropriate supervisor;....

(2) The court shall not sentence a defendant to probation and imprisonment except as authorized by part II ["Probation"] of this chapter.

(3) In addition to any disposition authorized in subsection (1) of this section, the court may sentence a person convicted of a misdemeanor or petty misdemeanor to a suspended sentence.

(4) The court may sentence a person who has been convicted of a violation to any disposition authorized in subsection (1) of this section except imprisonment.

....

(6) The court shall impose a compensation fee upon every person convicted of a criminal offense pursuant to section 351–62.6 [Compensation fee]; provided that the court shall waive the imposition of a compensation fee if it finds that the defendant is unable to pay the compensation fee.

(7) This chapter does not deprive the court of any authority conferred by law to decree a forfeiture of property, suspend or cancel a license, remove a person from office, or impose any other civil penalty. Such a judgment or order may be included in the sentence.

HRS § 706–605 (Supp.2002) (footnote added).

§ 351–62.5 Crime victim compensation special fund; when payments authorized. (a) There is established a crime victim compensation special fund from which the commission may make payments as provided in subsection (b). The fund shall be administered by the director of public safety for purposes of this chapter. Interest and investment earnings credited to the assets of the fund shall become part of the fund. Any balance remaining in the fund at the end of any fiscal year shall be carried forward for the next fiscal year.

(b) Where the commission has made an award pursuant to this chapter, the commission shall make the payments to or on behalf of the victim or one or more of the dependents of a deceased victim, or to or for the benefit of other persons who have suffered pecuniary loss or incurred expenses on account of hospital, medical, funeral, or burial expenses as a result of the victim's injury or death. Victims or dependents entitled to receive awards shall be notified of the option to have payments made on their behalf to other designated persons. Payments made pursuant to this section shall not exceed the total amount of the award.

(c) The amount appropriated under section 351–70 shall be redeposited into the fund and applied to other payments as authorized by the commission.

(d) Funds received pursuant to section 354D–12(b)(1) and amounts received pursuant to sections 351–35, 351–62.6, 351–63, 706–605, and 853–1 shall be deposited into the crime victim compensation special fund. Moneys received shall be used for compensation payments, operating expenses, salaries of positions as authorized by the legislature, and collection of fees. The commission may enter into memorandums of agreement with the judiciary for the collection of fees by the judiciary; provided that no funds shall be deposited by the judiciary into the crime victim compensation special fund until collected.

HRS § 351–62.5 (Supp.2002).

§ 351–62.6 Compensation fee. (a) The court shall impose a compensation fee upon every defendant who has been convicted or who has entered a plea under section 853–1 and who is or will be able to pay the compensation fee. The amount of the compensation fee shall be commensurate with the seriousness of the offense as follows:

(1) Not less than $100 nor more than $500 for a felony;

(2) $50 for a misdemeanor; and

(3) $25 for a petty misdemeanor.

The compensation fee shall be separate from any fine that may be imposed under section 706–640 ["Authorized fines"] and

shall be in addition to any other disposition under this chapter; provided that the court shall waive the imposition of a compensation fee if the defendant is unable to pay the compensation fee. Moneys from the compensation fees shall be deposited into the crime victim compensation special fund under section 351–62.5.

(b) The criteria of section 706–641 ["Criteria for imposing fines"] may apply to this section. In setting the amount of the compensation fee to be imposed, the court shall consider all relevant factors, including but not limited to:

(1) The seriousness of the offense;

(2) The circumstances of the commission of the offense;

(3) The economic gain, if any, realized by the defendant;

(4) The number of victims; and

(5) The defendant's earning capacity, including future earning capacity.

(c) The compensation fee shall be considered a civil judgment.

HRS § 351–62.6 (Supp.2002).

§ 706–640 **Authorized fines.** (1) A person who has been convicted of an offense may be sentenced to pay a fine not exceeding:

(a) $50,000, when the conviction is of a class A felony, murder in the first or second degree, or attempted murder in the first or second degree;

(b) $25,000, when the conviction is of a class B felony;

(c) $10,000, when the conviction is of a class C felony;

(d) $2,000, when the conviction is of a misdemeanor;

(e) $1,000, when the conviction is of a petty misdemeanor or a violation;

(f) Any higher amount equal to double the pecuniary gain derived from the offense by the defendant;

(g) Any higher or lower amount specifically authorized by statute.

(2) Notwithstanding section 706–641 ["Criteria for imposing fines"], the court shall impose a mandatory fine upon any defendant convicted of theft in the first or second degree committed by receiving stolen property as set forth in section 708–830(7). The fine imposed shall be the greater of double the value of the stolen property received or $25,000 in the case of a conviction for theft in the first degree; or the greater of double the value of the stolen property received or $10,000 in the case of a conviction for theft in the second degree. The mandatory fines imposed by this subsection shall not be reduced except and only to the extent that payment of the fine prevents the defendant from making restitution to the victim of the offense, or that the defendant's property, real or otherwise, has been forfeited under chapter 712A as a result of the same conviction for which the defendant is being fined under this subsection. Consequences for nonpayment shall be governed by section 706–644 ["Consequences of nonpayment; imprisonment for contumacious nonpayment; summary collection"]; provided that the court shall not reduce the fine under section 706–644(4) ["default ... not contumacious"] or 706–645 ["Revocation of fine or restitution"].

HRS § 706–640 (Supp.2002).

§ 706–641 **Criteria for imposing fines.** (1) The court shall not sentence a defendant only to pay a fine, when any other disposition is authorized by law, except in misdemeanor and petty misdemeanor cases.

(2) The court shall not sentence a defendant to pay a fine in addition to a sentence of imprisonment or probation unless:

(a) The defendant has derived a pecuniary gain from the crime; or

(b) The court is of the opinion that a fine is specially adapted to the deterrence of the crime involved or to the correction of the defendant.

(3) The court shall not sentence a defendant to pay a fine unless:

(a) The defendant is or will be able to pay the fine; and

(b) The fine will not prevent the defendant from making restitution to the victim of the offense.

(4) In determining the amount and method of payment of a fine, the court shall take into account the financial resources of the defendant and the nature of the burden that its payment will impose.

HRS § 706–641 (1993).

§ 706–642 **Time and method of payment.** (1) When a defendant is sentenced to pay a fine, the court may grant permission for the payment to be made within a specified period of time or in specified installments. If no such permission is embodied in the sentence, the fine shall be payable forthwith by cash, check, or by a credit card approved by the court.

(2) When a defendant sentenced to pay a fine is also sentenced to probation, the court may make the payment of the fine a condition of probation.

(3) When a defendant sentenced to pay a fine is also ordered to make restitution or reparation to the victim or victims, or to the person or party who has incurred loss or damage because of the defendant's crime, the payment of restitution or reparation shall have priority over the payment of the fine. No fine shall be collected until the restitution or reparation order has been satisfied.

HRS § 706–642 (1993).

§ 706–646 **Victim restitution.** (1) As used in this section, "victim" includes any of the following:

(a) The direct victim of a crime including a business entity, trust, or governmental entity;

(b) If the victim dies as a result of the crime, a surviving relative of the victim as defined in chapter 351; or

(c) A governmental entity which has reimbursed the victim for losses arising as a result of the crime.

(2) The court may order the defendant to make restitution for losses suffered by the victim or victims as a result of the defendant's offense. The court may order restitution to be paid to the crime victim compensation commission in the event that the victim has been given an award for compensation under chapter 351.

(3) Restitution shall be a dollar amount that is sufficient to reimburse any victim fully for losses including but not limited to: [13]

(a) Full value of stolen or damaged property, as determined by replacement costs of like property, or the actual or estimated cost of repair, if repair is possible;

(b) Medical expenses; and

(c) Funeral and burial expenses incurred as a result of the crime.

(4) The restitution ordered shall not affect the right of a victim to recover under section 351–33 ["Award of compensation"] or in any manner provided by law; provided that any amount of restitution actually recovered by the victim under this section shall be deducted from any award under section 351–33.

HRS § 706–646 (Supp.2002) (footnote added).

§ 706–647 **Civil enforcement.** (1) A certified or exemplified copy of an order of any court of this State for payment of a fine or restitution pursuant to section 706–605 may be filed in the office of the clerk of an appropriate court of this State as a special proceeding without the assessment of a filing fee or surcharge. The order, whether as an independent order, as part of a judgment and sentence, or as a condition of probation or deferred plea, shall be enforceable in the same manner as a civil judgment.

(2) In the event the victim has received or applied for reimbursement from any governmental entity, the victim named in the order or the victim's attorney shall also mail notice of the filing to the governmental entity providing reimbursement and shall file proof of mailing with the clerk.

(3) Fees for docketing, transcription, or other enforcement proceedings shall be as

---

**13.** In contrast to this provision, HRS § 706–605 (Supp.2002) prohibits the court from sentencing a defendant to pay restitution in an amount that is more than the defendant can afford to pay. *See supra* note 12.

provided by law for judgments of a court of this State.

HRS § 706–647 (Supp.2002).

**§ 706–644 Consequences of nonpayment; imprisonment for contumacious nonpayment; summary collection.** (1) When a defendant is sentenced pursuant to section 706–605, granted a conditional discharge pursuant to section 712–1255, or granted a deferred plea pursuant to chapter 853, and the defendant is ordered to pay a fee, fine, or restitution, whether as an independent order, as part of a judgment and sentence, or as a condition of probation or deferred plea, and the defendant defaults in the payment thereof or of any installment, the court, upon the motion of the prosecuting attorney or upon its own motion, may require the defendant to show cause why the defendant's default should not be treated as contumacious and may issue a summons or a warrant of arrest for the defendant's appearance. Unless the defendant shows that the defendant's default was not attributable to an intentional refusal to obey the order of the court, or to a failure on the defendant's part to make a good faith effort to obtain the funds required for the payment, the court shall find that the defendant's default was contumacious and may order the defendant committed until the fee, fine, restitution, or a specified part thereof is paid.

. . . .

(3) The term of imprisonment for nonpayment of fee, fine, or restitution shall be specified in the order of commitment, and shall not exceed one day for each $25 of the fee or fine, thirty days if the fee or fine was imposed upon conviction of a violation or a petty misdemeanor, or one year in any other case, whichever is the shorter period. A person committed for nonpayment of a fee or fine shall be given credit toward payment of the fee or fine for each day of imprisonment, at the rate of $25 per day.

(4) If it appears that the defendant's default in the payment of a fee, fine, or restitution is not contumacious, the court may make an order allowing the defendant additional time for payment, reducing the amount of each installment, or revoking the fee, fine, or the unpaid portion thereof in whole or in part, or converting the unpaid portion of the fee or fine to community service. A defendant shall not be discharged from an order to pay restitution until the full amount of the restitution has actually been collected or accounted for.[14]

(5) Unless discharged by payment or, in the case of a fee or fine, service of imprisonment pursuant to subsection (3), an order to pay a fee, fine, or restitution, whether as a part of a judgment and sentence, or as a condition of probation or deferred plea pursuant to chapter 853, may be collected in the same manner as a judgment in a civil action. The State or the victim named in the order may collect the restitution, including costs, interest, and attorney's fees, pursuant to section 706–646. The State may collect the fee or fine, including costs, interest, and attorney's fees pursuant to section 706–647.

(6) Attorney's fees, costs, and interest shall not be deemed part of the penalty, and no person shall be imprisoned under this section in default of payment of attorney's fees, costs, and interest.

HRS § 706–644 (Supp.2002) (footnote added).

**§ 706–624 Conditions of probation.** (1) Mandatory conditions . . .:

14. In light of this provision, query whether the following section of the HRS (Supp.2002) applies to penal restitution orders:

§ 657–5 Domestic judgments and decrees. Unless an extension is granted, every judgment and decree of any court of the State shall be presumed to be paid and discharged at the expiration of ten years after the judgment or decree was rendered. No action shall be commenced after the expiration of ten years from the date a judgment or decree was rendered or extended. No extension of a judgment or decree shall be granted unless the extension is sought within ten years of the date the original judgment or decree was rendered. A court shall not extend any judgment or decree beyond twenty years from the date of the original judgment or decree. No extension shall be granted without notice and the filing of a nonhearing motion or a hearing motion to extend the life of the judgment or decree.

(2) Discretionary conditions. The court may provide, as further conditions of a sentence of probation, to the extent that the conditions are reasonably related to the factors set forth in section 706–606 ["Factors to be considered in imposing a sentence"] and to the extent that the conditions involve only deprivations of liberty or property as are reasonably necessary for the purposes indicated in section 706–606(2), that the defendant:

(a) Serve a term of imprisonment not exceeding one year in felony cases, and not exceeding six months in misdemeanor cases; provided that notwithstanding any other provision of law, any order of imprisonment under this subsection that provides for prison work release shall require the defendant to pay thirty per cent of the defendant's gross pay earned during the prison work release period to satisfy any restitution order. The payment shall be handled by the adult probation division and shall be paid to the victim on a monthly basis;

(b) Perform a specified number of hours of services to the community as described in section 706–605(1)(e);

(c) Support the defendant's dependents and meet other family responsibilities;

(d) Pay a fine imposed pursuant to section 706–605(1)(b);

(e) Make restitution as specified in section 706–605(1)(d);

(f) Work conscientiously at suitable employment or pursue conscientiously a course of study or vocational training that will equip the defendant for suitable employment;

. . . .

(3) Written statement of conditions. The defendant shall be given a written copy of any requirements imposed pursuant to this section, stated with sufficient specificity to enable the defendant to guide the defendant's self accordingly.

HRS § 706–624 (1993).

§ 706–625 Revocation, modification of probation conditions. (1) The court, on application of a probation officer, the prosecuting attorney, the defendant, or on its own motion, after a hearing, may revoke probation except as provided in subsection (7), reduce or enlarge the conditions of a sentence of probation, pursuant to the provisions applicable to the initial setting of the conditions and the provisions of section 706–627.

(2) The prosecuting attorney, the defendant's probation officer, and the defendant shall be notified by the movant in writing of the time, place, and date of any such hearing, and of the grounds upon which action under this section is proposed. The prosecuting attorney, the defendant's probation officer, and the defendant may appear in the hearing to oppose or support the application, and may submit evidence for the court's consideration. The defendant shall have the right to be represented by counsel. For purposes of this section the court shall not be bound by the Hawaii rules of evidence, except for the rules pertaining to privileges.

(3) The court shall revoke probation if the defendant has inexcusably failed to comply with a substantial requirement imposed as a condition of the order or has been convicted of a felony. The court may revoke the suspension of sentence or probation if the defendant has been convicted of another crime other than a felony.

(4) The court may modify the requirements imposed on the defendant or impose further requirements, if it finds that such action will assist the defendant in leading a law-abiding life.

(5) When the court revokes probation, it may impose on the defendant any sentence that might have been imposed originally for the crime of which the defendant was convicted.

(6) As used in this section, "conviction" means that a judgment has been pronounced upon the verdict.

HRS § 706–625 (Supp.2002).

§ 706–627 Tolling of probation. (1) Upon the filing of a motion to revoke a probation or a motion to enlarge the conditions imposed thereby, the period of probation shall be tolled pending the hearing

upon the motion and the decision of the court. The period of tolling shall be computed from the filing date of the motion through and including the filing date of the written decision of the court concerning the motion for purposes of computation of the remaining period of probation, if any. In the event the court fails to file a written decision upon the motion, the period shall be computed by reference to the date the court makes a decision upon the motion in open court. During the period of tolling of the probation, the defendant shall remain subject to all terms and conditions of the probation except as otherwise provided by this chapter.

(2) In the event the court, following hearing, refuses to revoke the probation or grant the requested enlargement of conditions thereof because the defendant's failure to comply therewith was excusable, the defendant may be granted the period of tolling of the probation for purposes of computation of the remaining probation, if any.

HRS § 706-627 (1993).

**§ 706-630 Discharge of defendant.** Upon the termination of the period of the probation or the earlier discharge of the defendant, the defendant shall be relieved of any obligations imposed by the order of the court and shall have satisfied the disposition of the court, except as to any action under this chapter to collect unpaid fines, restitution, attorney's fees, costs, or interest.

HRS § 706-630 (Supp.2002).

**§ 706-670 Parole procedure; release on parole; terms of parole, recommitment, and reparole; final unconditional release.** (1) Parole hearing. A person sentenced to an indeterminate term of imprisonment shall receive an initial parole hearing at least one month before the expi-

ration of the minimum term of imprisonment determined by the Hawaii paroling authority pursuant to section 706–669. . . .

(2) Parole conditions. The authority, as a condition of parole, may impose reasonable conditions on the prisoner as provided under section 706–624 ["Conditions of probation"].[15]

(3) Prisoner's plan and participation. Each prisoner shall be given reasonable notice of the prisoner's parole hearing and shall prepare a parole plan, setting forth the manner of life the prisoner intends to lead if released on parole, including specific information as to where and with whom the prisoner will reside and what occupation or employment the prisoner will follow. . . .

. . . .

(4) Authority's decision; initial minimum term of parole. The authority shall render its decision regarding a prisoner's release on parole within a reasonable time after the parole hearing. . . . If parole is granted by the authority, the authority shall set the initial minimum length of the parole term.

(5) Release upon expiration of maximum term. If the authority fixes no earlier release date, a prisoner's release shall become mandatory at the expiration of the prisoner's maximum term of imprisonment.

(6) Sentence of imprisonment includes separate parole term. A sentence to an indeterminate term of imprisonment under this chapter includes as a separate portion of the sentence a term of parole or of recommitment for violation of the conditions of parole.

. . . .

(8) Length of recommitment and reparole after revocation of parole. If a parol-

---

**15.** This part of HRS § 706-670, which is in HRS § 706-670 (1993), authorizes the paroling authority, as a condition of parole, to impose reasonable conditions on the prisoner as provided under HRS § 706-624 ("Conditions of probation"). In other words, this statute authorizes the paroling authority to impose, as conditions of parole, the same conditions HRS § 706-624 authorizes the court to impose as conditions of probation. HRS § 706-624(2)(e) allows the

court the discretionary power to order the defendant to "[make] restitution as specified in section 706-605(1)(d)." HRS § 706-605(1)(d) (Supp. 2002) states, in part, that a "court may sentence a convicted defendant . . . [to] make restitution in an amount the defendant can afford to pay[.]" In *State v. Gaylord*, 78 Hawai'i 127, 890 P.2d 1167 (1995), this statutory authority was not discussed.

ee's parole is revoked, the term of further imprisonment upon such recommitment and of any subsequent reparole or recommitment under the same sentence shall be fixed by the authority but shall not exceed in aggregate length the unserved balance of the maximum term of imprisonment.

(9) Final unconditional release. When the prisoner's maximum parole term has expired or the prisoner has been sooner discharged from parole, a prisoner shall be deemed to have served the prisoner's sentence and shall be released unconditionally.

HRS § 706–670 (1993).

§ 801D–4 **Basic bill of rights for victims and witnesses.** (a) Upon written request, victims and surviving immediate family members of crime shall have the following rights:

(1) To be informed by the police and the prosecuting attorney of the final disposition of the case. If the crime charged is a felony, the victim or a surviving immediate family member shall be notified of major developments in the case and whenever the defendant or perpetrator is released from custody. The victim or a surviving immediate family member shall also be consulted and advised about plea bargaining by the prosecuting attorney;

. . . .

(6) To have any stolen or other personal property expeditiously returned by law enforcement agencies when the property is no longer needed as evidence. If feasible, all the property, except weapons, currency, contraband, property subject to evidentiary analysis, and property, the ownership of which is disputed, shall be returned to the person within ten days of being taken; and

(7) To be informed by the department of public safety of changes planned by the department in the custodial status of the offender that allows or results in the release of the offender into the community, including escape, furlough,

work release, placement on supervised release, release on parole, release on bail bond, release on appeal bond, and final discharge at the end of the prison term.

. . . .

(c) Notwithstanding any law to the contrary, the department of public safety, the Hawaii paroling authority, the judiciary probation divisions and branches, and the department of the attorney general shall make good faith efforts to notify the victim of a crime, or surviving immediate family members of a victim, of income received by a person imprisoned for that crime when the imprisoned person has received a civil judgment that exceeds $10,000, a civil settlement that exceeds $10,000, or any income that exceeds $10,000 in one fiscal year, whenever the income is known to the agency, and, in addition, the department of public safety shall make good faith efforts to notify the victim of a crime or surviving immediate family members of a victim, whenever it is known to the agency that a person imprisoned for that crime has a financial account, of which the department of public safety is aware, of a value exceeding $10,000.

(d) Notwithstanding any law to the contrary, payment of restitution and judgments to victims, or surviving immediate family members of a victim, shall be a precondition for release on parole for any imprisoned person whom the Hawaii paroling authority determines has the financial ability to make complete or partial restitution payments or complete or partial judgment payments to the victim of the person's crime, or to the surviving immediate family members of a victim.[16]

HRS § 801D–4 (Supp.2002).

§ 801D–5 **Responsibility for rights and services.** (a) Each county is responsible for the enforcement of rights under section 801D–4. The courts shall fashion all decisions and orders to enhance the recognition of these rights and the provi-

---

**16.** We note that HRS § 801D–4(c) and (d) became law on June 25, 2002, after the entry of judgment in this case.

sion of these services, to the extent that they will not conflict with the constitutional rights of the defendant.

HRS § 801D–5(a) (1993).

**§ 853–1 Deferred acceptance of guilty plea or nolo contendere plea; discharge and dismissal, expungement of records.** (a) Upon proper motion as provided by this chapter:

. ; . .

the court, without accepting the plea of nolo contendere or entering a judgment of guilt and with the consent of the defendant and after considering the recommendations, if any, of the prosecutor, may defer further proceedings.

(b) The proceedings may be deferred upon any of the conditions specified by section 706–624 ["Conditions· of probation"]. As a further condition, the court shall impose a compensation fee pursuant to section 351–62.6 ["Compensation fee"] upon every defendant who has entered a plea of guilty or nolo contendere to a petty misdemeanor, misdemeanor, or felony; provided that the court shall waive the imposition of a compensation fee, if it finds that the defendant is unable to pay the compensation fee.

HRS § 853–1(a) & (b) (Supp.2002).

■ The sentencing court, when it decides to order the defendant to pay restitution, must enter findings validating its decision that the total amount of restitution ordered is an amount the defendant is or will be able to pay during the time the restitution order remains unsatisfied and enforceable. Under current Hawaiʻi statutes, while a restitution order remains unsatisfied and enforceable, it may be enforced (1) in the criminal court as long as the criminal court retains jurisdiction over the defendant pursuant to HRS §§ 706–624, –625, and/or –644, (2) in paroling authority proceedings as long as the paroling authority retains jurisdiction over the defendant, and (3) in the civil court pursuant to collection proceedings pursued by the State or the victim. Thus, it is possible for a restitution order to remain unsatisfied and enforceable during the duration of both the defendant's life and the defendant's post-death estate.

The defendant's ability to pay under present Hawaiʻi statutes includes the defendant's current ability to pay plus the defendant's predicted ability to pay in the future as long as the restitution order remains unsatisfied and enforceable and during the continuation of the jurisdiction of the criminal court, the paroling authority, .and/or the civil courts over the defendant with respect to enforcement of the restitution order. The relevant time may include time in prison, time on probation or parole, or subsequent time.

In light of the statement in HRS § 706–644(4) that a "defendant shall not be discharged from an order to pay restitution until the full amount of the restitution has actually been collected or accounted for[,]" and the statement in HRS § 706–644(5) that a restitution order "may be collected in the same manner as a judgment in a civil action[,]" is there any time limit to the criminal court's power under HRS § 706–644 (Supp. 2002) to enforce its restitution order or to the civil court's power under HRS § 706–647 (Supp.2002) to enforce the criminal court's restitution order? Does HRS § 657–5's term limit on civil judgments apply to restitution orders? The answers to these questions are substantially relevant when deciding an amount of restitution and a manner· of its payment, both affordable to the defendant.

The following statutes provide some indication of relevant considerations for the court when deciding the amount and manner of payment of restitution:

1. HRS §§ 706–605(1)(d), 706–641(3)(b), and 706–642(3) give the payment of restitution priority over the payment of a fine and HRS § 706–605(1)(d) gives the payment of restitution priority over the payment of a compensation fee.

2. HRS § 351–62.6(b)(5) requires ·the court, when setting the amount of the compensation fee to be imposed, to consider the "defendant's earning capacity, including future earning capacity."

3. HRS § 706–641(3)(a) forbids the court from imposing a fine unless the "defendant is or will be able to pay the fine[.]"

4. HRS § 706–641(4) specifies that in "determining the amount and method of payment of a fine, the court shall take into account the financial resources of the defendant and the nature of the burden that its payment will impose."

5. HRS § 706–642(1) states as follows:

When a defendant is sentenced to pay a fine, the court may grant permission for the payment to be made within a specified period of time or in specified installments. If no such permission is embodied in the sentence, the fine shall be payable forthwith by cash, check, or by a credit card approved by the court.

6. HRS § 706–625(4) permits the court to modify probation conditions or requirements. This allows the court to control the payment of restitution during probation but it does not allow the court to modify the restitution amount specified in the sentence.

7. HRS § 706–644(4) states as follows:

If it appears that the defendant's default in the payment of a fee, fine, or restitution is not contumacious, the court may make an order allowing the defendant additional time for payment, reducing the amount of each installment, or revoking the fee, fine, or the unpaid portion thereof in whole or in part, or converting the unpaid portion of the fee or fine to community service. A defendant shall not be discharged from an order to pay restitution until the full amount of the restitution has actually been collected or accounted for.[17]

17. *See supra* note 14.

In other words, the only relief from a restitution order the criminal court may give is "an order allowing the defendant additional time for payment, [or] reducing the amount of each installment[.]"

Aside from relevant parole and probation conditions and requirements, the defendant's failure to pay restitution may be the subject of the State's and/or the victim's utilization of the laws governing the collection of a judgment in a civil action, and the defendant's "contumacious" failure to pay restitution may be the subject of the criminal court's authority under HRS § 706–644.

CONCLUSION

Accordingly, we reverse the Judgment with respect to Count Two, Ownership or Operation of Business by Certain Persons Prohibited, HRS § 842–2. We affirm the Judgment with respect to Count One, Extortion in the First Degree, HRS § 707–765(1)(a), except that we vacate that part of the sentence delegating to the State of Hawai'i, Department of Public Safety, the authority to determine the "PAYMENTS OF RESTITUTION AND CRIME VICTIM COMPENSATION FEE[.]" We remand for court action consistent with this opinion with respect to the vacated part of the Judgment.